**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                              )
BI 40 LLC,                    )
                              )
              Plaintiff,      )
                              )
v.                            )        Civil Action
                              )        No. 21-cv-11904-PBS
TEWKSBURY LIVING GROUP, LLC, EC )
TEWKSBURY, LLC, and MH TEWKSBURY )
OPERATING, LLC,               )
                              )
              Defendants.     )
_____)
                              )
ANN SUNY, as Executor of SUE T. )
FROST'S WILL,                 )
                              )
              Plaintiff,      )
                              )
v.                            )        Civil Action
                              )        No. 22-cv-11005-PBS
BI 40 LLC, KCP ADVISORY SERVICES, )
LLC, EF, LLC, and ROBERT      )
EISENSTEIN,                   )
                              )
              Defendants.     )
_____)
```

**MEMORANDUM AND ORDER**

February 13, 2025

Saris, D.J.

**INTRODUCTION**

This lawsuit arises from the abrupt transfer of Plaintiff Sue

T. Frost from Wood Haven Senior Living ("Wood Haven"), a memory

care assisted living facility in Massachusetts, in January 2022.[1] The transfer of Frost and other residents followed a series of pipe bursts that damaged significant parts of the facility. Defendant BI 40 LLC ("BI 40") is the lender that funded the purchase of Wood Haven and was responsible for funding operations at the facility when the entities that owned and operated Wood Haven were later placed into receivership. Frost alleges that BI 40 engaged in a resident-dumping scheme to minimize its financial losses. Following BI 40's motion to dismiss, Frost's remaining claims allege that BI 40 committed tortious interference with contract, aided and abetted a breach of fiduciary duty, and engaged in civil conspiracy. Frost also seeks equitable subordination of BI 40's claim in the related receivership action.

BI 40 now moves for summary judgment on Frost's remaining claims. After hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** BI 40's motion for summary judgment (Dkt. 244).

## BACKGROUND

### I.  Factual Background

The Court "recite[s] the facts in the light most favorable to the nonmovant -- here, [Frost] -- 'consistent with record support.'" Dixon-Tribou v. McDonough, 86 F.4th 453, 455 (1st Cir.

---

[1] Frost passed away in May 2024. The Court substituted Ann Suny, Frost's daughter and the executor of her estate, as the plaintiff in this case.

2023) (quoting <u>Lahens v. AT&T Mobility P.R., Inc.</u>, 28 F.4th 325, 328 (1st Cir. 2022)).

## A.    Frost's Residency at Wood Haven

Located in Tewksbury, Massachusetts, Wood Haven was a sixty-four-bed memory care assisted living facility that specialized in treating individuals with dementia. In May 2021, Frost, who suffered from dementia, anxiety, depression, arthritis, and dietary issues, signed a Residency Agreement to live at Wood Haven and moved in soon thereafter. The Residency Agreement required Wood Haven to give Frost thirty days' notice if it wished to terminate her tenancy.

## B.    BI 40's Initial Involvement with Wood Haven

BI 40 is a Florida-based single-purpose entity affiliated with a private lender called BridgeInvest. Its involvement with Wood Haven traces back to March 2019 when entities associated with Meridian Senior Living LLC (the "Meridian Entities") purchased the financially struggling facility with the aim of increasing resident enrollment and reinvigorating the business.[2] The Meridian Entities financed the purchase of Wood Haven with a $6.8 million loan from BI 40.

---

[2] The corporate structure of the entities involved in the ownership and operation of Wood Haven before the receivership is irrelevant for present purposes, so the Court refers only to the Meridian Entities generally.

The Meridian Entities' turnaround plan did not succeed, and Wood Haven began experiencing negative cash flow as early as June 2019. The COVID pandemic made matters worse, as state government restrictions prevented the facility from accepting new residents. By early April 2020, BI 40 was discussing the prospect that the Meridian Entities would default on the loan, the difficulty it would face in exercising its remedy of foreclosure, and the possibility of selling the loan.

On April 15, 2020, BI 40 sent the Meridian Entities a notice of default and acceleration of the loan. The parties eventually executed a forbearance agreement effective through October 2021, pursuant to which BI 40 advanced an additional $1 million to fund Wood Haven's operations. BI 40 asserts that it entered into this agreement to provide the Meridian Entities with more time and funding to improve operations and increase Wood Haven's resident census and revenue.

The Meridian Entities continued to hit roadblocks. After an inspection of Wood Haven uncovered operational deficiencies and regulatory violations, the Massachusetts Executive Office of Elder Affairs ("EOEA") issued a moratorium in June 2021 that barred the facility from accepting new residents. The Meridian Entities worked with the EOEA to try to remedy the deficiencies and violations, and BI 40 received regular updates on their work. The

EOEA was unsatisfied with the progress, however, and continued to identify new issues with the facility.

Around July 2021, BI 40 began considering options for the deteriorating situation at Wood Haven. BI 40 spoke with KCP Advisory Group, LLC ("KCP" or the "Receiver") about serving as a receiver for Wood Haven. BI 40 also urged the Meridian Entities to hire a crisis manager to help lift the EOEA's enrollment moratorium. BI 40 suggested a firm called EF, LLC ("EF") and assisted the Meridian Entities by negotiating with EF on the terms of the engagement and providing additional funds to hire EF. EF and the Meridian Entities executed a two-month consulting agreement in mid-August 2021, and the parties later extended the engagement.

EF started working at Wood Haven on September 1, 2021, and prepared regular updates that were sent to BI 40. In a cover email to its first report -- which BI 40 received -- EF mentioned "the severity of [its] concerns" about the status of Wood Haven. Dkt. 263-44 at 1.[3] Although the scope of EF's engagement did not include an in-depth assessment of the facility's physical infrastructure, EF's updates noted various building issues that came to its attention. By the end of October, EF recommended to BI 40 that a

---

[3] All docket citations are to the docket in <u>BI 40 LLC v. Tewksbury Living Group, LLC, et al.</u>, No. 21-cv-11904 (D. Mass. Nov. 24, 2021).

physical review of the facility be performed. EF's initial efforts were not enough to convince the EOEA to lift the enrollment moratorium, and the EOEA notified Wood Haven on November 1, 2021, that the moratorium would continue.

### C.    Problems with the Sprinkler System

BI 40 was aware of problems with Wood Haven's sprinkler system from the time of its initial loan to the Meridian Entities. Before finalizing the loan, BI 40 commissioned an inspection of Wood Haven, which identified areas of immediate or short-term concern with the property. One such area was the sprinkler system. As a result, the loan agreement included a $40,000 budget to replace the sprinklers, and BI 40 periodically disbursed funds for sprinkler repairs.

Issues with the sprinkler system persisted. According to a document in BI 40's possession in November 2020, Wood Haven incurred unexpected operating expenses after a fire suppression failure. During a January 2021 inspection, the Tewksbury Fire Department ("TFD") determined that the sprinkler system had a temporary compressor and required regular maintenance by a licensed service company. There is no evidence that BI 40 was told about this particular inspection, but BI 40 was aware that the sprinkler system required maintenance from time to time.

Within a month of starting its engagement at Wood Haven in September 2021, EF learned of a ceiling leak associated with the

sprinkler system. Tewksbury officials inspected the sprinkler system on October 27, 2021, and notified EF the next day that the "system ha[d] issues with a few zones not working" that "need[ed] repair ASAP (today) or the building w[ould] need a fire watch or possibly be evacuated." Dkt. 263-25 at 3-4. EF forwarded Tewksbury's notification to BI 40, which responded that it wanted to be on any calls about the sprinkler problem and other pressing building issues noted by the town. Some repairs were performed on the sprinkler system in the fall of 2021.

    **D.   Appointment of the Receiver**

At the end of the forbearance period on October 1, 2021, the Meridian Entities were unable to repay BI 40's loan. BI 40 kicked around options for how to proceed, including having the Meridian Entities buy off the loan, foreclosing on and then selling the facility, or taking ownership of Wood Haven itself. BI 40 also considered financial projections for Wood Haven and the possibility of applying for COVID-19 stimulus programs.

Ultimately, BI 40 opted to petition for a receiver to take over operations at Wood Haven. BI 40 testified that it did so with the hope that a receiver with assisted living facility expertise would stabilize operations, ensure the safety of residents, and eventually secure an end to the EOEA enrollment moratorium. Before filing its receivership petition, BI 40 had substantial

discussions about the situation at Wood Haven with KCP, the would-be receiver, and EF, which would manage operations on the ground.

On November 24, 2021, BI 40 filed an action in this Court alleging breach of contract by the Meridian Entities and seeking emergency appointment of KCP as a receiver (the "Receivership Action"). BI 40 argued that a receivership was necessary because the EOEA's enrollment moratorium was preventing the Meridian Entities from generating sufficient revenue to cover their operating expenses and loan obligations. BI 40 also argued that a receivership would allow it to provide the additional funding needed to improve conditions at Wood Haven in anticipation of a sale.

The Court convened a hearing on December 9, 2021. The Court initially expressed concern that the receivership would result in significant cost cuts that would impact the care received by residents. BI 40 responded that EF would "be primarily the boots on the ground, insuring [sic] that the standard of care to the residents is maintained, which is of the utmost priority right now." Dkt. 58 at 5-6. The Receiver added that it was in discussions with BI 40 about providing additional capital to stabilize operations at Wood Haven. BI 40 confirmed that it was "fully prepared to fund this case to the extent that . . . operating revenues are insufficient." Id. at 16. In response to a concern raised by the EOEA, BI 40 also committed that the Receiver would

comply with state law if Wood Haven were closed and the agreements with the residents were terminated, including a regulatory requirement that the facility give residents ninety days' notice of the closure. See 651 Mass. Code Regs. 12.03(10)(a) (2021).[4]

Following the hearing, the Court entered an order appointing KCP as a receiver (the "Receivership Order"). The Receivership Order required the Receiver to submit a budget that was "subject to review and written approval by [BI 40]" and absolved BI 40 of the "obligation to fund any disbursements which are not approved." Dkt. 23 ¶ 17. It also provided that "[p]rior to the Receiver and [BI 40's] agreement on [an] Initial Budget, the Receiver shall submit disbursement requests to [BI 40] and disbursements may be made in [BI 40's] sole and absolute discretion." Id. There is no evidence that the residents of Wood Haven or their families were ever told about the receivership.

The Receiver took over Wood Haven and retained EF to manage day-to-day operations. EF acted pursuant to the direction of the Receiver but provided regular updates to BI 40.

### E.  Building Inspection and Continued Sprinkler Issues

Upon assuming control of Wood Haven, the Receiver began efforts to improve the facility's operational deficiencies. The

---

[4] The Massachusetts regulation has since been amended to require 120 days' notice of the closure of an assisted living facility. See 651 Mass. Code Regs. 12.03(10)(a) (2025).

Receiver identified a number of concerns with the facility's physical infrastructure, including the sprinkler system. The Receiver pointed out some of these issues to a representative of BI 40 who visited Wood Haven shortly after entry of the Receivership Order. At EF's recommendation, the Receiver hired Building Operations, LLC ("Building Operations") to conduct a thorough inspection of the building. Meanwhile, a sprinkler leak required emergency repairs on December 28, 2021.

Building Operations inspected Wood Haven on January 5, 2022. That day, Building Operations informed EF that the necessary repairs to the building would cost between $3 million and $4 million. There is no evidence that EF conveyed this figure or any details about Building Operations' inspection to BI 40 that day.

On January 7, 2022 -- two days after the inspection -- the EOEA ordered Wood Haven to submit a proposal to address the issues with the sprinkler system (and problems with the door security system). Later that day, the Receiver sent BI 40 a draft response to the EOEA and told BI 40 that it would send the email "[a]s soon as [it] g[ot] the go-ahead from [BI 40] on funding commitment." Dkt. 247-11 at 2. BI 40 approved the Receiver's response, and the Receiver sent it on the evening of January 7. The response explained that Building Operations had "perform[ed] a high-level review of the property and its infrastructure" and "recommended a thorough review by [a sprinkler] contractor to develop an immediate

plan for remediation"; that this contractor was coming on January 10 for an assessment; and that employees were performing hourly "fire watch" rounds to ensure the sprinklers were not malfunctioning. Dkt. 247-12 at 4.

The sprinkler contractor performed a survey of the system on January 10. The contractor's invoice reflects that it recommended the entire system be replaced. The next day, EF stated in an email that Wood Haven "ha[d] contracted with [a company] to come in and mitigate the sprinkler system problem as soon as possible"; that this would "be a permanent fix"; and that the facility was "just arranging funding for it now." Dkt. 263-59 at 2.

On January 12, the Receiver emailed BI 40 that something had to be done that day about the sprinkler system because some of the zones were not working. The Receiver warned BI 40 that the TFD would require the facility to evacuate if the sprinkler system was not repaired. The sprinkler contractor came to perform emergency repairs that day. In the same email, the Receiver forwarded quotes from Building Operations for vendors, including the sprinkler contractor, "to figure out the existing systems and th[eir] existing condition, test the systems and then understand what repairs are necessary." Dkt. 247-13 at 3. The Receiver told BI 40 that if it received $100,000 that day, it "c[ould] use some of it for" these vendors. Id. As noted below, BI 40 wired the Receiver $100,000 later that day.

Around this time, the TFD ordered Wood Haven to update its emergency evacuation plan. As part of this undertaking, EF contacted other facilities to see if they could accept new residents.

### F.    Financing the Receiver's Operations

While the parties were getting a handle on the building's infrastructure issues, BI 40 and the Receiver also began negotiating financing for Wood Haven's ongoing operations. While BI 40 and the Receiver tried to find different sources of capital, most of their discussions concerned the budget and financing contemplated by the Receivership Order. The Receiver first asked for a protective advance from BI 40 on December 29, 2021, when it notified BI 40 that Wood Haven had overdrawn on its bank account. In the same email, the Receiver told BI 40 that it was "struggling to get good data for a proposed cash flow budget, mostly around the facility issues," and that it was going to "have to take a stab in the dark." Dkt. 248-16 at 1.

On January 3, 2022, the Receiver sent BI 40 a proposed budget. The budget requested $100,000 for each week in January and an additional $300,000 across February and March and estimated a total of $1.45 million for capital expenditures, including $225,000 for a "[n]ew [f]ire system." Dkt. 247-6 at 11. In its cover email, the Receiver asked BI 40 to transfer the first $100,000 of funding the next day. On January 6, a BI 40 employee internally circulated a

recommendation to release the first week's request for $100,000 to cover continuing operations and capital expenses necessary to lift the EOEA moratorium.

BI 40 emailed the Receiver a number of questions about its proposed budget on January 11. The Receiver promptly responded that it "need[ed] confirmation of funding ASAP" and that "[w]ithout a commitment, [it would] need to share with [the EOEA and the town] that [it could] not make the investments necessary to address the plan of correction and life safety issues." Dkt. 263-31 at 6-7. In later communications that day, the Receiver's counsel told BI 40's counsel that "a move to shutdown w[ould] be necessary" if the Receiver did not receive funding by the next day and that the Receiver's "current ask [was] $175,000." Id. at 2, 6.

The Receiver testified that it requested funding from BI 40 between five and ten times in late December 2021 and early January 2022 and that BI 40 only funded one of those requests. For its part, BI 40 testified that during the period when the parties were still negotiating the terms of the budget and financing, it reviewed the Receiver's funding requests via the preexisting approval process under the original loan agreement with the Meridian Entities, which required submission of a formal, written request. BI 40 conceded that the Receiver may have made "informal[]" funding requests via telephone or email but insisted that it approved all "official" requests. Dkt. 263-5 at 29, 31.

The Receiver submitted its first formal funding request for $100,000 on January 12, and BI 40 wired the money the same day. Among other expenses, this $100,000 was meant to cover the invoices from a staffing agency that had threatened to pull out of Wood Haven if it was not paid.

The Receiver and BI 40 continued to negotiate financing terms into mid-January. These negotiations included a back-and-forth about the terms and amount of a "wind-down budget" that would cover a thirteen-week period if the facility needed to shut down. Dkt. 263-31 at 4-5. BI 40 also suggested that the parties shorten the period of the financing to around two months; focus on operational costs through that point; and then, if the EOEA were to lift its moratorium, turn their attention to capital expenditures.

In a January 26 status report in the Receivership Action, the Receiver stated that "[t]he only budget approved by [BI 40] was dated 1/8/22, which detailed expected funding requirements of $750,000." Dkt. 29 at 5. Nevertheless, both BI 40 and the Receiver testified that BI 40 never approved the Receiver's budget, and the record reflects that the parties were still negotiating financing terms in mid-January when the evacuation occurred.

### G. Evacuation of Wood Haven

The immediate events leading to the evacuation of Wood Haven began on January 13, 2022, when a cracked sprinkler pipe flooded twelve rooms and forced residents to move to another section of

14

the facility. The pipe was repaired the same day. Frost was among the relocated residents, but her daughter was not informed. The Receiver told BI 40 about the incident and the repairs the next day and noted that the sprinklers were operational. On January 15, a sprinkler head on the same pipe leaked and flooded a resident room, necessitating further emergency repairs. The Receiver again notified BI 40 about the leak and the repairs the following day.

Matters came to a head on January 16. That morning, a pipe burst rendered the kitchen unusable and necessitated a temporary shutdown of the main water supply at the facility. Later that day, leaks from multiple pipes damaged more residents' rooms, which led Wood Haven to move all the residents into the one undamaged wing of the facility.

The Receiver and EF had a call during the evening of January 16 to discuss the unfolding situation. According to notes from the call, the Receiver told the group that "if [they] d[id not] shut [Wood Haven] down now, EOEA or [the TFD] w[ould] shut [them] down." Dkt. 263-29 at 2. One participant on the call testified that either the Receiver or EF affirmatively said that Wood Haven was shutting down. Others recalled that the Receiver stated that the facility needed to be shut down but was not sure how the shutdown would happen. The Receiver also suggested that Wood Haven find new placements for the residents so that the transfers could occur in an orderly fashion. EF started making arrangements for the

transfers that night. Notes from the call indicate that the Receiver intended to contact BI 40 that night, but the record contains no evidence as to whether the Receiver actually did so and, if it did, what BI 40 was told. The Receiver did, however, email BI 40 shortly after the call with EF to report the burst pipe in the kitchen and to tell BI 40 that they "[n]eed[ed] a solution immediately." Dkt. 263-18 at 7.

The TFD visited Wood Haven on the morning of January 17. The parties hotly dispute what happened during this visit. EF and the Receiver both testified that the TFD issued a verbal order to evacuate Wood Haven within three days. The TFD denied doing so. After the TFD's visit, EF and the Receiver began evacuating residents from Wood Haven. When the Receiver began the evacuation, it did not know whether the relocation of residents was permanent or whether the sprinkler issues could be repaired and the residents returned to the facility.

Midday on January 17, the Receiver told BI 40 what happened the day before and explained that "[t]his [was] now officially a shutdown." Dkt. 248-31 at 1. The Receiver also relayed that it had determined over the prior few days that it would cost about half as much to shut down the facility than to continue to operate it. BI 40 testified that it was unaware of the evacuation until it was underway.

The next morning, EF notified the Wood Haven residents that the facility was evacuating under an order from the TFD. Around the same time, the EOEA spoke to the TFD, which denied issuing an evacuation order. Based on the information from the TFD, the EOEA immediately emailed the Receiver ordering it to stop removing residents from Wood Haven and emphasizing that any closure of the facility must comply with the requirement of ninety days' notice under state law. The EOEA also told the Receiver to issue a corrected notice to the residents by that night explaining that no evacuation order had been issued. The Receiver failed to do so.

Although the Receiver learned that the TFD had disclaimed an evacuation order, the Receiver continued to believe that Wood Haven was uninhabitable and unsafe for the residents. The Receiver and EF therefore continued to transfer residents from the facility. The Receiver and EF testified that the transfers following the EOEA's order were voluntary and with the consent of the residents' families, and the record reflects efforts by the Receiver to ensure that this consent was secured. The Receiver notified BI 40 that it was continuing the transfers despite the TFD's disclaiming of the evacuation order due to the condition of the facility. The Receiver subsequently sent BI 40 multiple documents indicating that it was securing consent from the residents' families for the transfers. Only five residents remained at Wood Haven as of January 22.

Frost was among the residents evacuated during this period. Ann Suny, Frost's daughter, learned on January 18 that Wood Haven intended to transfer Frost to a different facility. When she learned this news, Suny was suffering from COVID-19 and, therefore, was unable to visit Wood Haven. Suny had conversations with EF on January 18 and January 19 in which EF represented that the TFD had ordered an evacuation of Wood Haven. EF also threatened Suny that Frost would be "taken away and placed in nursing homes across the state wherever there was space available." Dkt. 263-32 at 5. Frost's transfer occurred on January 19. While a contemporaneous record indicates that Suny consented to the transfer, Suny denies that any consent she may have given was voluntary or fully informed.

At its corporate deposition, the Receiver was asked about the adequacy of the funding it received from BI 40. The Receiver testified that its decision-making during the receivership "was based on what funding [it] could get from [BI 40]" and that, at times, "that lack of funding . . . prevented [it] from fulfilling [its] duties as a receiver." Dkt. 263-6 at 24, 26. The Receiver also answered affirmatively when asked whether "part of the reason why [the sprinkler system] wasn't improved was because [it was not] getting funding from BI 40." Dkt. 263-8 at 5-6. That said, the Receiver stated that it "c[ould not] answer [the] question" of whether the "lack of funding caused significant impact to the

18

resident [sic] of the facilities," noting that it was "not sure that the funding would have been sufficient or fast enough to resolve the issues prior to the events . . . that ended on [January] 17th." Id. at 6. The Receiver later reiterated that it was "not sure that in the five weeks from the beginning of the receivership . . . there was enough time before these pipes burst to address all the issues" and that it was "unclear . . . that any funding sooner would have necessarily made a change." Dkt. 248-30 at 2-3. Finally, the Receiver denied that the evacuation on January 17 was "a financial decision." Dkt. 248-15 at 19.

### H.   Post-Evacuation Events

On January 21, 2022, EF received a written report from Building Operations about its January 5 inspection. The report documented a litany of infrastructural problems with the building. As relevant here, the report noted issues with the sprinkler system, advised that Wood Haven "immediately implement a mitigation and repair plan," and warned that "[t]he likelihood of a catastrophic event is imminent and should be taken seriously." Dkt. 248-19 at 4 (cleaned up). The report estimated that immediately needed repairs to the building would cost between $950,000 and $1.2 million and that a total budget of between $3.5 million and $4 million would be required to bring the building into compliance with state and local regulations.

Following the evacuation, BI 40 and the Receiver considered whether it was possible to repair and reopen the facility and maintain the operating license. BI 40 had internal discussions about whether it was willing to cover the substantial capital expenditures required to reopen the facility, especially with little-to-no revenue coming in. BI 40 learned that there was no mechanism to temporarily shut down the facility for repairs and then reopen it without losing the license.

As these discussions were happening, the Receiver notified BI 40 on January 25 that it would file an emergency motion in the Receivership Action "to shut down the facility immediately and compel [BI 40] to fund operations." Dkt. 263-18 at 31. Because it lacked funds to pay Wood Haven's bills, the Receiver advised that "some of the costs that currently cannot be paid will result in treble damages." Id. The Receiver filed its emergency motion the following day, requesting that the Court allow Wood Haven to close without the required ninety days' notice. In its accompanying status report, the Receiver explained that "[o]utstanding operational expenses, including payroll, total[ed] in excess of $400,000" and that the Receiver and its counsel "ha[d] yet to be paid." Dkt. 29 at 5. The same day, the Receiver sent BI 40 its second formal funding request for $225,000, which BI 40 approved and disbursed on January 27.

The Court convened a hearing on the Receiver's emergency motion on January 27. The Court declined to close Wood Haven immediately in light of both assurances by EOEA and TFD officials that the facility was habitable and doubts about whether the Court had the authority to waive the ninety-day notice requirement.

The day after the hearing, BI 40 told the Receiver that it wanted to proceed to a receivership sale as quickly as possible. A few days later, the Receiver issued a ninety-day closure notice for Wood Haven. The Receiver also worked with the remaining handful of residents to arrange voluntary transfers to other facilities. The final residents left Wood Haven on February 11. While the Receiver was arranging the final transfers, BI 40 informed the Receiver that it would not be providing more funding "[b]ased on the exorbitant cost of maintaining the facility with no incoming revenue." Dkt. 263-37 at 2. Nonetheless, BI 40 did disburse almost $19,000 to the Receiver on February 11 and around $250,000 to various vendors over the subsequent nine months.

By this point, the entities in receivership owed BI 40 around $9 million in secured debt. On the Receiver's motion, the Court agreed to put Wood Haven up for auction. BI 40 was the sole bidder, offering to pay $2.6 million in a credit bid and $408,770 in cash. The Court approved the sale to BI 40, which promptly resold the property for $3.8 million.

21

I.    **Effects on Frost of Her Transfer from Wood Haven**

Frost submitted an expert report about the effects of her transfer from Wood Haven. Dr. Elizabeth H. Nasser, a clinical psychologist specializing in geropsychology and neuropsychology, opined that Frost suffered from "an increase in restlessness, agitation, anxiety, lethargy and depression immediately following the move to the new facility." Dkt. 263-4 at 3. Dr. Nasser also opined that Frost "moved from a moderate to severe stage of dementia over the course of just a single month" and that this "rapid decline appears to be a direct result of the unplanned and traumatic move to a new facility." Id. at 7. BI 40 disputes Dr. Nasser's opinion about the effects of the transfer on Frost but has not offered its own expert opinion on the subject.

II.   **Procedural History**

Frost intervened in the Receivership Action in April 2022. Two months later, she filed suit against BI 40, the Receiver, EF, and a principal of EF (the "Frost Action"). Frost asserted a slew of state statutory and common-law claims in her third amended complaint.

BI 40 moved to dismiss all of Frost's claims against it. The Court allowed the motion except as to the claims for civil conspiracy, tortious interference with contract, and aiding and abetting a breach of fiduciary duty. See Frost v. BI 40, LLC, No. 22-cv-11005-PBS, 2023 WL 6307530, at *8-9 (D. Mass. Aug. 29,

2023). On the conspiracy claim, the Court explained that Frost alleged that BI 40, the Receiver, and EF together "operated a resident dumping scheme," "conspired to commit breaches of the fiduciary duties owed to the [r]esidents in furtherance of this scheme," acted with "actual malice . . . unrelated to a legitimate corporate interest," and deliberately fabricated the evacuation order to expel the residents and allow BI 40 to take control of Wood Haven. Id. at *7 (alteration in original). The Court held that Frost stated a claim for tortious interference with her Residency Agreement for similar reasons and because she alleged that BI 40 intentionally withheld funding to force Wood Haven's closure. See id. at *7-8. And Frost's claim for aiding and abetting a breach of fiduciary duty survived based on her allegations that BI 40's withholding of funding and role in the resident dumping scheme constituted active participation in the breach of the Receiver's and EF's fiduciary duties to residents. See id. at *8. Finally, the Court explained that it would address Frost's request for equitable subordination of BI 40's claim on the receivership assets in the context of the Receivership Action. See id. at *6.[5]

---

[5] The Receiver also moved to dismiss Frost's claims against it on the basis of quasi-judicial immunity and failure to state a claim. The Court dismissed some claims due to quasi-judicial immunity but otherwise denied the Receiver's motion to dismiss. See Frost, 2023 WL 6307530, at *4-5. The Receiver filed an interlocutory appeal challenging the Court's refusal to dismiss certain claims based on quasi-judicial immunity. See Frost v. KCP Advisory Grp., LLC, No. 23-1800 (1st Cir. Sept. 26, 2023). That appeal remains pending.

In due course, the Court consolidated the Receivership Action and the Frost Action for purposes of discovery. Once discovery concluded, BI 40 moved for summary judgment on Frost's remaining causes of action and her request for equitable subordination of its claim in the Receivership Action.[6]

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute is one which 'a reasonable jury could resolve . . . in the favor of the non-moving party,' and a material issue is one with the 'potential to affect the outcome . . . under the applicable law.'" Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 108 (1st Cir. 2024) (alterations in original) (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017)). In determining whether to grant summary judgment, a court must construe "the facts in the light most favorable to the non-moving party" and "draw[] all reasonable inferences" in her favor. Id.

---

[6] Six former Wood Haven residents other than Frost (or their representatives) filed similar lawsuits to hers. The Court stayed those suits pending resolution of the Receivership Action and the Frost Action. Three of those plaintiffs filed an opposition to BI 40's motion for summary judgment in the Frost Action. Insofar as they raise arguments not advanced by Frost, the Court declines to address those arguments at this juncture.

(quoting Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 408 (1st Cir. 2015)).

The party seeking summary judgment "must [first] adumbrate 'an absence of evidence to support the nonmoving party's case.'" Pleasantdale Condos., LLC v. Wakefield, 37 F.4th 728, 733 (1st Cir. 2022) (alteration in original) (quoting Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir. 1989)). Once the movant does so, "[t]he burden then shifts to the nonmovant to establish the existence of a genuine issue of material fact." Id. To satisfy this burden, the nonmovant "must present definite, competent evidence" showing that a trialworthy issue exists. Id. (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)). "[C]onclusory allegations, improbable inferences, and unsupported speculation" do not suffice. Kinzer, 99 F.4th at 108 (quoting Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018)).

## DISCUSSION

Three of Frost's claims survived BI 40's motion to dismiss: tortious interference with contract, civil conspiracy, and aiding and abetting a breach of fiduciary duty. See Frost, 2023 WL 6307530, at *9. The Court discusses these three remaining claims and then addresses Frost's request for equitable subordination in the Receivership Action.

## I.   <u>Tortious Interference with Contract</u>

Frost first alleges that BI 40 tortiously interfered with her Residency Agreement with Wood Haven. To succeed on a tortious interference claim under Massachusetts law, "a plaintiff must establish that '(1) [s]he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.'" <u>Weiler v. PortfolioScope, Inc.</u>, 12 N.E.3d 354, 363 (Mass. 2014) (quoting <u>Psy-Ed Corp. v. Klein</u>, 947 N.E.2d 520, 536 (Mass. 2011)); <u>see</u> <u>Tenants' Dev. Corp. v. AMTAX Holdings 227, LLC</u>, 248 N.E.3d 647, 662 (Mass. 2025).

BI 40 does not dispute that Frost's Residency Agreement with Wood Haven was a valid contract that satisfies the first element. BI 40 argues, however, that no reasonable jury could conclude on this record that Frost has proven the remaining elements of her claim.

For a tortious interference claim, "intentionality requires that the defendant 'either desired to bring about the harm to the plaintiff or [] kn[ew] that this result was substantially certain to be produced by [its] conduct.'" <u>Conformis, Inc. v. Aetna, Inc.</u>, 58 F.4th 517, 539 (1st Cir. 2023) (alterations in original) (quoting <u>Restatement (Second) of Torts</u> ch. 37, intro. note (Am. L. Inst. 1979)). "Massachusetts courts will find the improper motive

element met when a defendant exhibits '"actual malice" or "a spiteful, malignant purpose, unrelated to [a] legitimate corporate interest."'" Hamann v. Carpenter, 937 F.3d 86, 90 (1st Cir. 2019) (alteration in original) (quoting Tuli v. Brigham & Women's Hosp., 656 F.3d 33, 43 (1st Cir. 2011)). The improper means inquiry asks "whether the defendant 'violated a statute or a rule of common law[,] . . . used threats, misrepresented any facts, defamed anyone, or used any other improper means' in interfering with the business relationship." Conformis, Inc., 58 F.4th at 540 (alterations in original) (quoting United Truck Leasing Corp. v. Geltman, 551 N.E.2d 20, 24 (Mass. 1990)). Finally, the plaintiff must show that the defendant's interference "caused her harm." Sindi v. El-Moslimany, 896 F.3d 1, 23 (1st Cir. 2018); see Med. Air Tech. Corp. v. Marwan Inv., Inc., 303 F.3d 11, 22 (1st Cir. 2002) ("Without causation, there can be no claim for tortious interference . . . .").

As framed in her opposition to BI 40's summary judgment motion, Frost advances two interrelated theories of how BI 40 tortiously interfered with her Residency Agreement. First, she contends that once BI 40 realized it could not salvage Wood Haven's prospects, it participated in fabricating an evacuation order from the TFD on January 17, 2022, to justify evicting the residents for the purpose of minimizing its financial losses. Second, Frost posits that, for similar reasons, BI 40 intentionally underfunded

Wood Haven's operations under the receivership and, thus, forced the Receiver to transfer the residents after the pipes repeatedly burst between January 13 and January 16, 2022.

### A.    Evacuation and Shutdown Decision

The record does not support Frost's theory that BI 40 was involved in fabricating the TFD evacuation order. There is a genuine dispute as to whether the TFD ordered the Receiver and EF to evacuate Wood Haven on the morning of January 17. But even if the TFD never issued an order to evacuate -- and the Receiver and/or EF falsely stated there was such an order -- no reasonable jury could conclude that BI 40 played a role in evacuating the facility under false pretenses.

To begin, there is no evidence that, as Frost asserts, BI 40 directed the Receiver to shut down Wood Haven in the days before the evacuation began on January 17. Frost points to emails exchanged by counsel for BI 40 and the Receiver on January 12 that discussed a "Wind-Down Budget" and a "Wind-Down Reserve." Dkt. 263-31 at 4-5. These were provisions of the financing agreement that the parties were negotiating and did not imply an order from BI 40 to shut down Wood Haven. Frost also cites a set of January 12 emails in which EF found placements for Wood Haven residents at other facilities, but the emails make clear that EF made these arrangements as part of an evacuation plan that the TFD required Wood Haven to create. See Dkt. 263-30 at 2-3.

28

Moreover, Frost offers no evidence that BI 40 either knew that the Receiver and EF had fabricated the evacuation order or played a role in deciding to evacuate the facility. Rather, the record reflects that the Receiver told BI 40 about the multiple pipe bursts between January 13 and January 16, see Dkt. 248-23 at 2; Dkt. 248-27 at 1; Dkt. 263-18 at 7; decided to evacuate the facility without BI 40's input on either January 16 or January 17, see Dkt. 248-17 at 13-15, 21, 35; Dkt. 263-3 at 8; and then informed BI 40 after the resident transfers were already underway that it was shutting down the facility, see Dkt. 248-9 at 11-12; Dkt. 248-31 at 1-2. Frost does cite notes from a call between the Receiver and EF on January 16, which indicate that the Receiver intended to speak to BI 40 that evening. See Dkt. 263-29 at 2. But the only evidence of any subsequent communication that day between the Receiver and BI 40 is an email in which the Receiver reported the burst kitchen pipe and emphasized to BI 40 that they "[n]eed[ed] a solution immediately." Dkt. 263-18 at 7. It would be pure speculation to conclude that BI 40 and the Receiver decided together on the evening of January 16 to evacuate Wood Haven under false pretenses the next day.

Nor does the record reflect any culpability on BI 40's part in the Receiver's decision to continue transferring residents from Wood Haven after the EOEA reported on January 18 that the TFD had not ordered an evacuation. Suny, Frost's daughter, insists that

she was isolating with COVID-19 when Frost was transferred, that EF continued to tell her that an evacuation order was in place, and that EF threatened to send Frost to any facility with space in Massachusetts. See Dkt. 263-32 at 5-6. Frost has, therefore, raised a genuine dispute as to whether her January 19 transfer was consensual. Again, though, the record does not provide a basis for concluding that BI 40 was aware that Frost's transfer was without consent or participated in the decision to continue the resident transfers. To the contrary, the Receiver told BI 40 that it was continuing to transfer residents because it believed the facility was unsafe, see Dkt. 248-9 at 13-14, and sent BI 40 multiple documents indicating that it was securing consent for the transfers from the residents' families, see Dkt. 248-35 at 1; Dkt. 263-74 at 2-3.

The absence of evidence that BI 40 directed the Receiver to evacuate the residents or shut down Wood Haven, knew the TFD's evacuation order was fabricated, or was aware the Receiver was transferring residents without their consent is fatal to this theory of tortious interference. Without such evidence, a reasonable jury could not conclude that BI 40 intended for the Receiver to breach Frost's Residency Agreement by evacuating or transferring her or acted with improper motive or means. Frost's mere speculation that BI 40 participated in a scheme to fabricate the evacuation order or transfer residents under false pretenses

is insufficient to fend off summary judgment. See Rodríguez v. Encompass Health Rehab. Hosp. of San Juan, Inc., __ F.4th __, __ (1st Cir. 2025) [2025 WL 274217, at *1] (emphasizing "the bedrock principle that a party opposing summary judgment must adduce specific evidence sufficient to create a genuine issue of material fact").

**B.    Underfunding of Operations During the Receivership**

Frost's second theory of tortious interference with contract is that BI 40 intentionally underfunded Wood Haven's operations during the receivership, thereby causing the Receiver to evict her in violation of her Residency Agreement. Frost has offered sufficient evidence to raise a triable claim of tortious interference under this theory.

A reasonable jury could conclude that by underfunding Wood Haven's operations, BI 40 knowingly induced the Receiver to breach Frost's Residency Agreement. As discussed above, there is a genuine dispute as to whether Frost's transfer was consensual and, thus, whether the Receiver violated the Residency Agreement's requirement that Frost be given thirty days' notice of termination of her tenancy.

Turning to BI 40's knowledge and intent, the record contains evidence that BI 40 was well aware of the poor state of the Wood Haven facility, including the sprinkler system. At least as early as September 2021 when EF began sending BI 40 updates about its

31

work at Wood Haven, BI 40 knew of serious operational and infrastructural problems with the facility. See Dkt. 263-14 at 2-14; see also Dkt. 263-44 at 2 (September 7 cover letter from EF describing "the severity of [its] concerns" about Wood Haven). BI 40 was also informed in October 2021 when the TFD threatened to evacuate the facility if the sprinkler system was not immediately repaired. See Dkt. 263-25 at 3-4. A representative from BI 40 visited Wood Haven in late December 2021 or early January 2022, at which point the Receiver pointed out areas of concern with the building. See Dkt. 248-15 at 4, 14. Moreover, the Receiver forwarded to BI 40 the EOEA's January 7 email in which the EOEA ordered Wood Haven to come up with immediate proposals to fix the door security and sprinkler systems. See Dkt. 247-10 at 2-3.

The record also contains evidence that BI 40 knew from early in the receivership that the Receiver needed funding promptly in order to maintain operations at the facility. On December 29, 2021, for example, the Receiver asked BI 40 for a protective advance because Wood Haven had overdrawn on its bank account. See Dkt. 248-16 at 1. BI 40 was also aware that at the beginning of January 2022, a staffing agency threatened to pull its workers from Wood Haven because its invoices were not paid. See Dkt. 248-16 at 1; Dkt. 263-11 at 3-5. On January 11, the Receiver's counsel told BI 40's counsel that "a move to shutdown [would] be necessary" if BI 40 did not disburse funding by the next day. Dkt. 263-31 at 6.

Finally, there is evidence that BI 40 funded the receivership at an unreasonably slow pace. BI 40 did not provide the Receiver with the first disbursement of funds until January 12, about two weeks after the Receiver first asked for a protective advance on December 29. The Receiver testified that it requested funding five to ten times during this period. See Dkt. 263-6 at 5, 23-25. When BI 40 finally did disburse funding to the Receiver, it only provided $100,000 even though the Receiver made clear the day before that its then-"current ask [was] $175,000." Dkt. 263-31 at 2. And after most of the residents were evacuated in mid-January, BI 40 provided a second round of funding once the Receiver had incurred over $400,000 in outstanding operational expenses and had threatened to file an emergency motion in the Receivership Action "to shut down the facility immediately and compel [BI 40] to fund operations." Dkt. 263-18 at 31; see Dkt. 29. A jury could find BI 40's delay in providing funding to the Receiver to be unreasonable given its knowledge of the exigent conditions at Wood Haven.

The Court concludes that a jury could reasonably infer that BI 40 delayed providing funding to the Receiver and underfunded the receivership with a desire to precipitate a shutdown of Wood Haven. In addition, the motive that Frost posits for BI 40's underfunding -- that BI 40 wanted to minimize its losses after realizing that it could not salvage its investment in Wood Haven -- is plausible in light of the record.

33

BI 40 insists that it intended to maintain Wood Haven as an operational assisted living facility until the pipe bursts and subsequent evacuation of the residents made doing so impossible. In support, BI 40 points to contemporaneous evidence suggesting that its aim during the receivership was to keep operating Wood Haven and make improvements to the facility in order to lift the EOEA enrollment moratorium. See, e.g., Dkt. 247-6 at 2-3; Dkt. 247-11 at 2; Dkt. 248-4 at 32-33. BI 40 also cites evidence indicating that, even after the evacuation, it considered whether Wood Haven could reopen. See, e.g., Dkt. 248-1 at 58-61; Dkt. 248-17 at 26-28; Dkt. 248-30 at 7-8; Dkt. 263-75 at 2; Dkt. 271 ¶ 351. And it is true that Frost has offered no smoking gun evidence of BI 40's unlawful intent. But a court cannot "weigh the evidence" on a summary judgment motion. Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014). The evidence of BI 40's knowledge of the dire state of the facility and the pace of its disbursements would allow a rational factfinder to disbelieve BI 40's claim that it intended to keep Wood Haven open.

Frost has also offered sufficient evidence to show that BI 40 interfered with her Residency Agreement via improper means. "Violating a court order certainly constitutes an 'improper . . . means'" for purposes of a tortious interference claim. Wolfson v. Am. Airlines, Inc., 170 F. Supp. 2d 87, 93 (D. Mass. 2001)

(alteration in original). Here, a reasonable jury could find that BI 40's underfunding violated the Receivership Order.

The parties vigorously dispute whether BI 40 complied with the funding terms of the Receivership Order. Frost emphasizes that when BI 40 sought appointment of a receiver, it reassured the Court that it was "fully prepared to fund this case to the extent that . . . operating revenues are insufficient" and that "the standard of care to the residents" was "of the utmost priority." Dkt. 58 at 5-6, 16. In Frost's view, BI 40 did not live up to this promise because, among other things, BI 40 failed to approve numerous funding requests made by the Receiver, Wood Haven overdrew on its bank account, and the Receiver lacked sufficient funding to pay for staff and necessary repairs at the facility. BI 40 responds that the Receivership Order gave it "sole and absolute discretion" to approve the Receiver's disbursement requests before the parties agreed on a budget. Dkt. 23 ¶ 17. BI 40 also notes that its representation to the Court solely concerned covering operating expenses and not capital expenditures and that it did approve the one and only "formal" disbursement request the Receiver made before the evacuation (for $100,000 on January 12).

A reasonable jury could conclude that BI 40 underfunded Wood Haven's operations in violation of the Receivership Order.[7] When

---

[7] Frost and certain other former Wood Haven residents who have intervened in the Receivership Action have moved to hold BI 40 in

approving the receivership, the Court relied on BI 40's representation that it would adequately fund operations at Wood Haven to ensure the well-being of the residents. Although this representation did refer to "operating expenses," ensuring resident well-being requires maintaining a habitable and safe building. And the Receivership Order did not mandate the procedure for "formal" disbursement requests on which BI 40 now relies. Moreover, for the reasons offered by Frost, the record supports a finding that BI 40 did not provide sufficient funding to maintain an adequate standard of care for the residents. The fact that the Receiver had incurred over $400,000 in outstanding operational expenses by January 26 is concerning, especially since the Receiver testified that its decision-making "was based on what funding [it] could get from [BI 40]" and that, at times, "that lack of funding . . . prevented [it] from fulfilling [its] duties as a receiver." Dkt. 263-6 at 24, 26.

Finally, Frost has raised a triable case that BI 40's unlawful interference with her Residency Agreement caused her harm. BI 40 does not meaningfully dispute that Dr. Nasser's expert report offers sufficient evidence that Frost suffered physical and psychological effects from her abrupt transfer from Wood Haven. Frost causally connects BI 40's underfunding to these effects in

---

contempt for violating the Receivership Order. The Court takes no position on those contempt motions at this time.

two ways. First, she posits that the lack of adequate funding caused the pipes to burst between January 13 and January 16, which in turn led to her transfer from the facility. Second, she argues that the Receiver decided to shut down Wood Haven because it did not have the funds to continue to maintain operations at Wood Haven.

The record adequately supports both causation theories. The Receiver testified equivocally at its deposition as to whether additional funding from BI 40 could have prevented the pipe bursts between January 13 and January 16 that led to Wood Haven's closure. See, e.g., Dkt. 248-30 at 2-3 ("The inability to get funds was clearly an issue relative to the ongoing operations of the facility. I'm not sure that in the five weeks from the beginning of the receivership to this point that there was enough time before these pipes burst to address all the issues, so it's unclear to me . . . that any funding sooner would have necessarily made a change."); Dkt. 263-8 at 5-6 (answering affirmatively when asked whether "part of the reason why [the sprinkler system] wasn't improved was because [the Receiver was not] getting funding from BI 40"). Deciding what aspects of the Receiver's equivocal testimony to credit is a role for the jury. In addition, a rational jury could find that the Receiver decided to shut down Wood Haven because it did not have the funds to continue to maintain operations. Although the Receiver testified that its choice to

evacuate Wood Haven was not "a financial decision," Dkt. 248-15 at 19, the Receiver performed an analysis of the costs of continuing operations versus shutting down the facility in the days before the evacuation, see Dkt. 263-40 at 2-3.

### C.  Conclusion

Accordingly, the Court grants summary judgment to BI 40 on Frost's claim for tortious interference with contract with regard to the decisions about the evacuation and transfer of residents from Wood Haven in the days following the pipe bursts. The Court denies BI 40's summary judgment motion with regard to Frost's theory that it underfunded operations at Wood Haven during the receivership.

## II.  **Civil Conspiracy**

The Court now turns to Frost's claim against BI 40 for civil conspiracy.

### A.  Applicable Law

Massachusetts law provides for two types of civil conspiracy: true conspiracy and concerted action conspiracy. See Greene v. Philip Morris USA Inc., 208 N.E.3d 676, 682 (Mass. 2023). To succeed on a claim of true conspiracy, "a plaintiff must prove that alleged conspirators agreed to accomplish an unlawful purpose or 'a lawful purpose by unlawful means,' and then caused harm to the plaintiff via 'some "peculiar power of coercion"' that they would not have had, had they been acting independently." Id. at

38

685 n.10 (citation omitted) (first quoting Willett v. Herrick, 136 N.E. 366, 370 (Mass. 1922); and then quoting DesLauries v. Shea, 13 N.E.2d 932, 935 (Mass. 1938)). Circumstances giving rise to liability under this theory "are rare and should be added to with caution." Id. (quoting Fleming v. Dane, 22 N.E.2d 609, 611 (Mass. 1939)); see Anoush Cab, Inc. v. Uber Techs., Inc., 8 F.4th 1, 24 (1st Cir. 2021) (describing true conspiracy as "a rare cause of action").

A concerted action claim is "akin to a theory of common law joint liability in tort." Id. at 683 (quoting Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994)). This form "of civil conspiracy requires an underlying tort [and t]he conspiracy consists in agreeing to, or assisting in, this underlying tort." Thomas v. Harrington, 909 F.3d 483, 490 (1st Cir. 2018) (alteration in original) (quoting Taylor v. Am. Chemistry Council, 576 F.3d 16, 35 (1st Cir. 2009)).

"To prove a 'concerted action' conspiracy, a plaintiff must show that defendants either (1) acted 'in concert with or pursuant to a common design with' the tortfeasor or (2) 'gave substantial assistance to' the tortfeasor's conduct." Id. (quoting Kyte v. Philip Morris Inc., 556 N.E.2d 1025, 1027 (Mass. 1990)). The "common design" theory has two elements: "first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some

39

tortious act in furtherance of the agreement." Id. (quoting Aetna Cas. Sur. Co., 43 F.3d at 1564). And "under the 'substantial assistance' theory, 'a person may be liable in tort if he "knows that the . . . conduct [of another person] constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."'" Id. at 491 (alterations in original) (quoting Kurker v. Hill, 689 N.E.2d 833, 837 (Mass. App. Ct. 1998)). While the substantial assistance theory does not require the plaintiff to "provide evidence of an agreement between the defendant and the tortfeasor," the plaintiff must show the defendant's "intent to substantially assist or encourage" another's tortious conduct. Id. (quoting Taylor, 576 F.3d at 35).

**B. Analysis**

Frost advances civil conspiracy claims under each of the true conspiracy, common plan, and substantial assistance theories.

*1. True Conspiracy and Common Plan Theories*

Frost's true conspiracy and common plan theories allege that BI 40 entered into an agreement with the Receiver and/or EF to unlawfully evict her and the other residents from Wood Haven. BI 40 argues that Frost has offered insufficient evidence to prove that it entered into any such agreement or common plan with either the Receiver or EF. The Court agrees with BI 40. See Daly v. Mason, __ F. Supp. 3d __, __ (D. Mass. 2024) [2024 WL 4426420, at *11] (dismissing true conspiracy claim where the plaintiff did not

"point to any facts indicating an actual agreement between Defendants"); Jakuttis v. Town of Dracut, 656 F. Supp. 3d 302, 340 (D. Mass. 2023) (granting summary judgment to the defendants on a concerted action claim where the record lacked evidence of "an express or implied agreement between [the defendants] or any kind of 'common plan'" (quoting Bettencourt v. Town of Mendon, 334 F. Supp. 3d 468, 487 (D. Mass. 2018))).

Frost argues that a reasonable factfinder could infer the existence of a tacit agreement or common plan to unlawfully evict the residents because BI 40 brought the Receiver and EF into Wood Haven and was in close contact with them about the situation at the facility throughout the period leading up to the mid-January 2022 evacuation. To be sure, a conspiratorial agreement need not be express, see Thomas, 909 F.3d at 490, and its existence may be inferred from the parties' conduct, see id.; Mackey v. Town of Tewksbury, 433 F. Supp. 3d 116, 172 (D. Mass. 2020). But to infer that BI 40 conspired with the Receiver and EF based on the facts Frost cites would be to engage in "unsupported speculation" that is insufficient to show a genuine dispute of material fact. Kinzer, 99 F.4th at 108 (quoting Ellis, 883 F.3d at 7); see Echavarria v. Roach, 565 F. Supp. 3d 51, 100 (D. Mass. 2021) (granting summary judgment to defendants on concerted action claim where the record contained no evidence of an agreement and instead reflected that

the parties merely worked together and communicated with each other).

In fact, the record is replete with evidence contradicting the inference that BI 40 entered into a conspiratorial agreement or common plan with either the Receiver or EF. BI 40 was at loggerheads with the Receiver and EF throughout the receivership, especially about the level of funding BI 40 was providing.[8] BI 40 also did not pay the Receiver's and EF's fees in full or promptly: the Receiver and its counsel had received nothing by January 26, 2022, and EF ended up settling with BI 40 for a $15,000 discount on its fees. See Dkt. 29 at 5; Dkt. 263-2 at 25. This evidence is inconsistent with the existence of an agreement to unlawfully evict the residents among BI 40, the Receiver, and EF.

Nor do the circumstances surrounding the decision to transfer residents from Wood Haven in mid-January 2022 support a reasonable

---

[8] See Dkt. 263-31 at 6-7 (January 11, 2022 emails from the Receiver to BI 40 stating that it "need[ed] confirmation of funding ASAP" and that "unless [it] ha[d] funding tomorrow, [it thought] a move to a shutdown will be necessary"); Dkt. 263-6 at 26 (Receiver testimony responding affirmatively to whether "the lack of funding ever prevented [it] from fulfilling [its] duties as a receiver"); Dkt. 263-29 at 2 (notes of January 16 call between the Receiver and EF, during which the Wood Haven executive director said that she "d[id not] trust BI [40] to fund what [the facility] need[ed]"); Dkt. 263-18 at 31 (January 25, 2022 email from the Receiver to BI 40 stating that it was "drafting a motion . . . to shut down the facility immediately and compel [BI 40] to fund operations"); Dkt. 30 at 5 (January 26, 2022 emergency motion from the Receiver to close Wood Haven discussing "the impasse between the Receiver and [BI 40] as to funding the Facility").

inference that BI 40 and the Receiver or EF agreed to unlawfully evict the residents. As noted, there is a genuine dispute on this record as to whether the TFD ordered the Receiver and EF to evacuate Wood Haven on the morning of January 17. Yet there is no evidence that BI 40 knew either that the Receiver and EF had fabricated the evacuation order or that Wood Haven was in fact habitable when the Receiver insisted that it was not. Similarly, even if Frost was transferred from Wood Haven without her daughter's informed consent, the record offers no basis to conclude that BI 40 was aware of that fact. Finally, while a reasonable jury could conclude that BI 40 wanted Wood Haven to shut down for financial motives, Frost points to nothing suggesting that BI 40 and the Receiver entered into an agreement to do so. Without knowledge of the allegedly tortious nature of the Receiver's decisions regarding the evacuation of the facility, BI 40 cannot have entered into an unlawful agreement or common plan.

## 2.    *Substantial Assistance Theory*

Frost also advances a claim of civil conspiracy under the substantial assistance theory. She asserts that BI 40 substantially assisted the Receiver's breach of fiduciary duty and the Receiver's and EF's tortious interference with her Residency Agreement in connection with her transfer from Wood Haven.

This theory of civil conspiracy fails because the record does not support a reasonable finding that BI 40 was aware of any

tortious conduct by the Receiver or EF that it substantially and intentionally assisted or encouraged. See Thomas, 909 F.3d at 491 (requiring, inter alia, that the defendant "knows that the . . . conduct [of another person] constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself" (alterations in original) (quoting Kurker, 689 N.E.2d at 837)). Again, no reasonable juror could find that BI 40 knew that the Receiver or EF fabricated the TFD evacuation order as a pretext to evict the residents.

## III. Aiding and Abetting Breach of Fiduciary Duty

Frost next claims that BI 40 aided and abetted a breach of fiduciary duty by the Receiver. This claim has three elements: "(1) there must be a breach of fiduciary duty, (2) the defendant must know of the breach, and (3) the defendant must actively participate or substantially assist in or encourage the breach to the degree that he or she could not reasonably be held to have acted in good faith." Arcidi v. Nat'l Ass'n of Gov't Emps., Inc., 856 N.E.2d 167, 174 (Mass. 2006).

Frost's aiding and abetting claim is materially identical to her civil conspiracy theory alleging that BI 40 substantially assisted the Receiver's breach of fiduciary duty. See Mass. Port Auth. v. Turo Inc., 166 N.E.3d 972, 981-82 (Mass. 2021) (applying the elements of a substantial assistance theory to a claim of aiding and abetting a tort); Kyte, 556 N.E.2d at 1028

44

(characterizing a civil conspiracy claim based on substantial assistance as an "aiding and abetting theory"). The Court has already concluded that no reasonable jury could find BI 40 liable for substantially assisting a breach of fiduciary duty by the Receiver. For the same reasons, summary judgment is also warranted in BI 40's favor on Frost's claim for aiding and abetting a breach of fiduciary duty.

## IV. **Equitable Subordination in the Receivership Action**

Finally, Frost seeks equitable subordination of BI 40's claim to the assets of the receivership in the Receivership Action. BI 40 moves for summary judgment on the basis that it did not engage in inequitable conduct that would warrant equitable subordination. BI 40 also contends that there are no assets left in the receivership estate that could be used to satisfy claims by any creditor, except for $100,000 that it deposited into escrow to secure any liability on its part to Frost. See Dkt. 88 ¶ 9; Dkt. 128 ¶ P.

The doctrine of equitable subordination allows a bankruptcy court to "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim." In re Merrimac Paper Co., 420 F.3d 53, 59 (1st Cir. 2005) (quoting 11 U.S.C. § 510(c)(1)). This remedy is warranted when 1) "the claimant [is] found to have engaged in inequitable conduct"; 2) "the misconduct . . . either resulted in injury to creditors or

g[ave] the claimant an unfair advantage"; and 3) equitable subordination is not "in conflict with the provisions of federal bankruptcy law." Id. The doctrine of equitable subordination is applicable in receiverships. See SEC v. Spongetech Delivery Sys., Inc., 98 F. Supp. 3d 530, 551 (E.D.N.Y. 2015).

As previously discussed, Frost has raised a genuine dispute as to whether BI 40 intentionally underfunded the receivership and whether she suffered harm as a result. If proven at trial, that underfunding would qualify as "inequitable conduct" that could justify equitably subordinating BI 40's interest in any remaining receivership assets to Frost's claim.

## ORDER

For the foregoing reasons, BI 40's motion for summary judgment (Dkt. 244) is **DENIED** as to Frost's claim in the Frost Action for tortious interference with contract (Count X) with regard to her allegations of underfunding operations during the receivership and **ALLOWED** as to Frost's other theories of tortious interference with contract (Count X) and her claims of civil conspiracy (Count VII) and aiding and abetting a breach of fiduciary duty (Count XVI). The Court also **DENIES** BI 40's motion for summary judgment as to Frost's request for equitable subordination in the Receivership Action.

SO ORDERED.

                                    /s/ PATTI B. SARIS
                                    Hon. Patti B. Saris
                                    United States District Judge